Nos. 22-2082, 22-2101

_____

# United States Court of Appeals for the Fourth Circuit

_____

ANNE ARUNDEL COUNTY, MARYLAND,

*Plaintiff-Appellee*,

v.

BP P.L.C., *et al.*,

*Defendants-Appellants*.

_____

Appeal from the United States District Court
for the District of Maryland, No. 1:21-cv-01323-SAG
(The Honorable Stephanie A. Gallagher)

_____

CITY OF ANNAPOLIS, MARYLAND,

*Plaintiff-Appellee*,

v.

BP P.L.C., *et al.*,

*Defendants-Appellants*.

_____

Appeal from the United States District Court
for the District of Maryland, No. 1:21-cv-00772-SAG
(The Honorable Stephanie A. Gallagher)

_____

**DEFENDANTS-APPELLANTS' OPENING BRIEF**

_____

Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
thungar@gibsondunn.com

Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
(213) 229-7000
tboutrous@gibsondunn.com

*Counsel for Defendants-Appellants Chevron Corporation and Chevron U.S.A. Inc.*
[*Additional counsel listed on signature page*]

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellants submit the following statement:

BP p.l.c., a publicly traded corporation organized under the laws of England and Wales, has no parent corporation, and there is no publicly held corporation that owns 10% or more of BP p.l.c.'s stock.

BP America Inc. is a 100% wholly owned indirect subsidiary of BP p.l.c., and no intermediate parent of BP America Inc. is a publicly traded corporation.

BP Products North America Inc. is also a 100% wholly owned indirect subsidiary of BP p.l.c., and no intermediate parent of BP Products North America Inc. is a publicly traded corporation.

Chevron Corporation has no parent corporation, and no publicly held company holds 10% or more of its stock.

Chevron U.S.A. Inc. is a wholly owned subsidiary of Chevron Corporation.

CITGO Petroleum Corporation is a wholly owned indirect subsidiary of Petróleos de Venezuela S.A., which is the national oil

company of the Bolivarian Republic of Venezuela. No publicly held company owns 10% or more of its stock.

CNX Resources Corporation is a publicly held corporation and does not have a parent corporation. BlackRock, Inc., through itself or its subsidiaries, owns 10% or more of CNX Resources Corporation's stock.

ConocoPhillips has no parent corporation, and no publicly held company holds 10% or more of its stock.

ConocoPhillips Company is a wholly owned subsidiary of ConocoPhillips.

CONSOL Energy Inc. is a publicly held corporation and does not have a parent corporation. BlackRock, Inc., through itself or its subsidiaries, owns 10% or more of CONSOL Energy Inc.'s stock.

Crown Central New Holdings LLC is the sole member of Crown Central LLC. The sole member of Crown Central New Holdings LLC is Rosemore Holdings, Inc., a wholly owned subsidiary of Rosemore, Inc. No publicly held company owns 10% or more of Rosemore, Inc.'s stock.

Hess Corporation has no parent corporation, and no publicly held corporation holds 10% or more of its stock.

CONSOL Marine Terminals LLC is a wholly owned subsidiary of CONSOL Energy Sales Company LLC, which is a wholly owned subsidiary of CONSOL Energy Inc.

Exxon Mobil Corporation has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

ExxonMobil Oil Corporation's corporate parent is Mobil Corporation, which owns 100% of ExxonMobil Oil Corporation's stock. Mobil Corporation, in turn, is wholly owned by Exxon Mobil Corporation.

Marathon Oil Corporation does not have a parent corporation and is a publicly traded entity. The Vanguard Group, Inc., an investment advisor that is not a publicly traded corporation, disclosed through a Schedule 13G/A filed with the SEC that it beneficially owns 10% or more of Marathon Oil Corporation's stock.

Marathon Oil Company is a wholly owned subsidiary of Marathon Oil Corporation.

Marathon Petroleum Corporation is a publicly held corporation and does not have a parent corporation. BlackRock, Inc., through itself or its subsidiaries, owns 10% or more of Marathon Petroleum Corporation's stock.

iii

Phillips 66 has no parent corporation. The Vanguard Group is the only shareholder owning 10% or more of Phillips 66.

Phillips 66 Company is wholly owned by Phillips 66.

Shell plc (*f/k/a* Royal Dutch Shell plc) has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Shell USA, Inc. (*f/k/a* Shell Oil Company) is a wholly owned subsidiary of Shell Petroleum Inc., whose ultimate corporate parent is Shell plc (*f/k/a* Royal Dutch Shell plc).

Speedway LLC is an indirect subsidiary of Seven & i Holdings, Co., Ltd. Seven & i Holdings Co., Ltd., through itself or its subsidiaries, owns more than 10% of Speedway LLC's stock.

American Petroleum Institute is a non-profit, tax-exempt organization incorporated in the District of Columbia. It is a non-stock corporation and thus has no parent organization, and no publicly held corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................... 1

JURISDICTIONAL STATEMENT ................................... 4

ISSUES PRESENTED ...................................................... 5

STATEMENT OF THE CASE ........................................... 6

STANDARD OF REVIEW ................................................ 9

SUMMARY OF THE ARGUMENT .................................. 10

ARGUMENT .................................................................... 13

I.    These Actions Are Removable Under The Federal Officer
Removal Statute ............................................................... 13

    A.    Defendants' extraction, production, and sales activities
under federal officers "relat[e] to" Plaintiffs' civil action ..... 15

        1.    Defendants' new evidence demonstrates that its
oil and gas activities under federal direction were
substantial and pervasive such that they
necessarily relate to Plaintiffs' lawsuits ..................... 16

        2.    Defendants' federal activities necessarily relate to
Plaintiffs' alleged physical injuries ............................. 19

    B.    Plaintiffs' attempted disclaimer fails .................................... 28

    C.    Defendants acted under federal officers .............................. 32

        1.    Defendants presented evidence of new categories
of actions under federal officers .................................. 32

        2.    The record in these cases fills the specific
evidentiary gaps found in *Baltimore IV* ..................... 44

        3.    Defendants have asserted colorable federal
defenses ...................................................................... 54

# TABLE OF CONTENTS
*(continued)*

**Page**

II.   The Action Is Removable Because Plaintiffs' Claims
      Necessarily Raise Disputed And Substantial Issues Under
      The First Amendment ................................................................. 60

III.  Defendants Preserve Additional Arguments That Plaintiffs'
      Claims Arise Under Federal Law ................................................ 67

CONCLUSION ........................................................................................ 68

STATUTORY ADDENDUM .................................................................. 77

vi

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Am. Elec. Power Co. v. Connecticut,*
564 U.S. 410 (2011)................................................................57, 67

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003)...............................................................59

*Arco Oil & Gas Co.,*
1982 WL 961730 (Min. Mgmt. Serv. Apr. 9, 1982) ...........................53

*Arizona v. Manypenny,*
451 U.S. 232 (1981)...............................................................55

*Baker v. Atl. Richfield Co.,*
962 F.3d 937 (7th Cir. 2020)............................................ 14, 26, 27, 30

*Ballenger v. Agco Corp.,*
2007 WL 1813821 (N.D. Cal. June 22, 2007) ....................................31

*Baltimore Scrap Corp. v. David J. Joseph Co.,*
81 F. Supp. 2d 602 (D. Md. 2000) ......................................................59

*Bordenkircher v. Hayes,*
434 U.S. 357 (1978).................................................................59

*Boyle v. United Techs. Corp.,*
487 U.S. 500 (1988)...............................................................56

*BP P.L.C. v. Mayor & City Council of Baltimore,*
141 S. Ct. 1532 (2021)...............................................................5

*Brecht v. Abrahamson,*
507 U.S. 619 (1993)...............................................................20

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*California ex rel. Brown v. Watt*,
  668 F.2d 1290 (D.C. Cir. 1981) ........................................................ 51

*Campbell-Ewald v. Gomez*,
  5778 U.S. 153 (2016) ...................................................................... 57

*Citaramanis v. Hallowell*,
  613 A.2d 964 (Md. 1992) ................................................................. 25

*City of Milwaukee v. Illinois*,
  451 U.S. 304 (1981) ........................................................................ 67

*City of New York v. Chevron Corp.*,
  993 F.3d 81 (2d Cir. 2021) ......................................................... 25, 26

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
  996 F.3d 243 (4th Cir. 2021) ............ 3, 13, 14, 21, 26, 27, 29, 30, 34, 54

*Colo. River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976) ........................................................................ 20

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
  615 F.3d 291 (4th Cir. 2010) ........................................................... 57

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
  888 F.3d 640 (4th Cir. 2018) ........................................................... 58

*Devengoechea v. Bolivarian Republic of Venezuela*,
  889 F.3d 1213 (11th Cir. 2018) ........................................................ 21

*Farina v. Nokia Inc.*,
  625 F.3d 97 (3d Cir. 2010) .............................................................. 57

*France.com, Inc. v. French Republic*,
  992 F.3d 248 (4th Cir. 2021) ...................................................... 21, 26

viii

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Fry v. Napoleon Cmty. Sch.*,
  580 U.S. 154 (2017)................................................................22

*Gourdine v. Crews*,
  405 Md. 722 (2008) ...........................................................25

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005)....................................... 4, 5, 9, 60, 61, 66

*Gully v. First Nat'l Bank*,
  299 U.S. 109 (1936)..............................................................63

*Gunn v. Minton*,
  568 U.S. 251 (2013)........................................................60, 65

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989)..............................................................58

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988)...............................................................62

*Illinois v. City of Milwaukee*,
  406 U.S. 91 (1972)..........................................................57, 67

*Jefferson Cnty. v. Acker*,
  527 U.S. 423 (1999)........................................... 13, 27, 54

*Latiolais v. Huntington Ingalls, Inc.*,
  951 F.3d 286 (5th Cir. 2020) (en banc).............................20

*Mayor & City Council of Baltimore v. BP P.L.C.*,
  31 F.4th 178 (4th Cir. 2022) ..................1, 3, 11, 14, 16, 18, 19, 22, 35,
                                        44, 45, 49, 67

*Mayor & City Council of Baltimore v. BP P.L.C.*,
  952 F.3d 452 (4th Cir. 2020).......................................14, 33

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990)..................................................................62

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964).........................................................61, 62

*Nat'l Review, Inc. v. Mann*,
    140 S. Ct. 344 (2019)......................................................65, 66

*Nessel v. Chemguard, Inc.*,
    2021 WL 744683 (W.D. Mich. Jan. 6, 2021)........................31

*O'Connell v. Foster Wheeler Energy Corp.*,
    544 F. Supp. 2d 51 (D. Mass. 2008)...................................31

*OBB Personenverkehr AG v. Sachs*,
    577 U.S. 27 (2015)..........................................................21, 22

*Oneok, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015).............................................................56

*Ortiz v. Univ. of Med. & Dentistry of N.J.*,
    2009 WL 737046 (D.N.J. Mar. 18, 2009).............................63

*Papp v. Fore-Kast Sales Co.*,
    842 F.3d 805 (3d Cir. 2016) ..........................................40, 55

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986).....................................................61, 62, 5

*The Prize Cases*,
    67 U.S. (2 Black) 635 (1863) ..............................................36

*Ripley v. Foster Wheeler LLC*,
    841 F.3d 207 (4th Cir. 2016).....................................10, 55, 56

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Rosenblatt v. Exxon Co., U.S.A.*,
  642 A.2d 180 (Md. 1994)......................................................................24

*Ruppel v. CBS Corp.*,
  701 F.3d 1176 (7th Cir. 2012)............................................................21

*Sawyer v. Foster Wheeler LLC*,
  860 F.3d 249 (4th Cir. 2017)............................................. 13, 14, 21, 33

*Schuman v. Greenbelt Homes, Inc.*,
  69 A.3d 512 (Md. Ct. Spec. App. 2013)..............................................24

*Shell Oil Co. v. United States*,
  751 F.3d 1282 (Fed. Cir. 2014) .....................................................35, 39

*Snyder v. Phelps*,
  580 F.3d 206 (4th Cir. 2009)...............................................................62

*United States v. Gaubert*,
  499 U.S. 315 (1991)..............................................................................58

*United States v. Norman*,
  935 F.3d 232 (4th Cir. 2019)...............................................................20

*VonRosenberg v. Lawrence*,
  781 F.3d 731 (4th Cir. 2015)...............................................................20

*Watson v. Philip Morris Cos.*,
  551 U.S. 142 (2007)........................................................................32, 42

*W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*,
  23 F.4th 288 (4th Cir. 2022) .........................................................37, 48

*Willingham v. Morgan*,
  395 U.S. 402 (1969)..............................................................................27

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Yearsley v. W.A. Ross Const. Co.*,
  309 U.S. 18 (1940) .......................................................................... 55, 58

**Statutes**

28 U.S.C. § 1442(a) ................................................ 5, 10, 13, 19, 20, 22, 31

28 U.S.C. § 1446(b)(2)(A) ......................................................................... 5

42 U.S.C. § 6241(d)(1) ............................................................................ 43

43 U.S.C. § 1332(3) ................................................................................. 49

43 U.S.C. § 1349 ...................................................................................... 8

43 U.S.C. § 1349(b)(1) ......................................................................... 6, 67

43 U.S.C. § 1802(1)-(2) ........................................................................... 52

Defense Production Act of 1950,
  Pub. L. No. 81-774, 64 Stat. 798 ...................................................... 41

Energy Policy and Conservation Act,
  Pub. L. No. 94-163, 89 Stat. 871 (1975) ............................................ 43

**Other Authorities**

94 Cong. Rec. S903-11 (Jan. 27, 1975) ...................................................... 51

Dep't of Interior, OCS Order No. 2 (Jan. 1, 1975) .................................... 53

Gerald D. Nash, *United States Oil Policy, 1890-1964:*
  *Business and Government in Twentieth-Century America*
  (1968) .............................................................................................. 42

H.R. Rep. No. 115-965 (2017) .................................................................. 43

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

Serhii Plokhy, *Nuclear Folly: A History of the Cuban Missile Crisis* (2021) .......................................................................... 37

U.S. Geological Survey, Monthly Engineering Report, Conservation Division, Oil and Gas Leasing Branch, Gulf Coast Region, Volume 125 (Jan.-Mar. 1958) ...................................... 54

# INTRODUCTION

Plaintiffs, Anne Arundel County and the City of Annapolis, filed these two consolidated cases in Maryland state court, seeking to use Maryland state trespass and nuisance law to impose liability on selected energy companies for physical harms allegedly attributable to the effects of global climate change stemming from the cumulative impact of the worldwide production, promotion, sale, and use of oil and gas going back decades. Defendants removed the cases to federal district court on various grounds, and the district court ordered the cases remanded to state court for lack of federal jurisdiction.

In the past few years, several courts—including this one—have considered similar lawsuits raising related jurisdictional issues, and several of those cases are pending on petitions for writs of certiorari before the Supreme Court, which has called for the views of the Solicitor General of the United States.[1] This Court decided some of the issues presented in this appeal in *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th

---

[1] *See, e.g., Suncor Energy (U.S.A.) Inc. v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, No. 21-1550 (U.S.); *BP p.l.c. v. Mayor & City Council of Baltimore*, No. 22-361 (U.S.); *Chevron Corp. v. San Mateo Cnty.*, No. 22-495 (U.S.); *Sunoco LP v. City & Cnty. of Honolulu*, No. 22-523 (U.S.); *Shell Oil Prods. Co. v. Rhode Island*, No. 22-524 (U.S.).

178 (4th Cir. 2022) ("*Baltimore IV*"), and Defendants-Appellants respectfully preserve their arguments on certain of those issues for further review.

This appeal, however, also presents several arguments that *Baltimore IV* did not have occasion to consider. First, the district court believed that it was bound by *Baltimore IV* to reject Defendants' federal officer removal arguments. But Defendants here have raised new arguments and provided new evidence that this Court did not have before it and did not pass upon in *Baltimore IV*. For example, the record in this case contains far more evidence and examples of Defendants extracting and producing oil and gas under the direction of federal officers. In *Baltimore IV*, this Court held on the more limited record there that the defendants' federal actions were too attenuated from the plaintiff's claims to confer jurisdiction. The new evidence here, however, demonstrates that Defendants' federal actions were so substantial and pervasive that, even under the analysis employed in *Baltimore IV*, their production and sale of fossil-fuel products were not too attenuated from Plaintiffs' claims. Additionally, this new evidence confirms that substantial amounts of

Defendants' production and sale of fossil fuels do in fact qualify as acts under federal officers so as to confer jurisdiction.

Moreover, *Baltimore IV* did not directly confront a key element of the relevant inquiry mandated by the federal officer removal statute. *Baltimore IV* held that removal jurisdiction was lacking because, in its view, "[a]ny connection between [defendants'] fossil-fuel production . . . and the conduct alleged in the Complaint is simply too remote," given the Court's conclusion that "the source of tort liability" was not production but defendants' alleged misrepresentations. 31 F.4th at 232-33. But that analysis mistakenly overlooks a fundamental and dispositive legal point: the relatedness inquiry mandated by the federal removal statute is not limited to the plaintiff's theory of liability, but instead requires courts to consider whether the defendant's federal action relates to the plaintiff's alleged *injury*. *See Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc*., 996 F.3d 243, 251-52 (4th Cir. 2021) (focusing on the acts that allegedly caused the "injuries" and on the "harm" that gave rise to the "damages" that the plaintiff seeks). Here, the relief that Plaintiffs seek—and the global causal phenomenon on which it depends—necessarily sweeps in all of Defendants' fossil-fuel production.

The Court in *Baltimore IV* was never confronted with—and thus never decided—the argument that federal officer removal is proper so long as the defendant's federal act is related to the plaintiff's alleged *injury*. Under a proper application of the law, federal officer removal is appropriate.

Finally, to the extent that Plaintiffs' claims challenge Defendants' speech, they are removable under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), another argument that *Baltimore IV* did not address. The Complaints here identify alleged misrepresentations as an essential step in the causal chain, and thus Plaintiffs cannot prevail without demonstrating that the alleged misrepresentations are not protected by the First Amendment. Plaintiffs' claims therefore necessarily incorporate affirmative federal constitutional elements imposed by the First Amendment, making them removable under *Grable*.

## JURISDICTIONAL STATEMENT

Defendants timely removed the *City of Annapolis* and *Anne Arundel County* actions to the United States District Court for the District of Maryland on March 25, 2021, and May 27, 2021, respectively. 28 U.S.C.

4

§ 1446(b)(2)(A); J.A.1-2; J.A.706-707.  The district court had jurisdiction under 28 U.S.C. §§ 1331, 1367(a), 1441(a), 1442, and 1446, and 43 U.S.C. § 1349(b).

On September 29, 2022, the district court granted Plaintiffs' motions to remand, J.A.1486-1487, and, on October 11, 2022, Defendants timely filed notices of appeal under 28 U.S.C. §§ 1291 and 1447(d), J.A.1489; J.A.1507.

This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1447(d) to review the district court's entire remand order.  *See BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021).

## ISSUES PRESENTED

**I.**    Whether the district court had jurisdiction under 28 U.S.C. § 1442(a)(1) because, under that statute's liberal construction in favor of removal, Plaintiffs' claims are "for or relating to" injuries allegedly caused by emissions from oil and gas, a substantial amount of which Defendants produced at the direction of federal officers.  *See* J.A.1476-1483.

**II.**    Whether the district court had removal jurisdiction under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), for claims raising substantial and disputed

federal questions, given that Plaintiffs' claims include federal constitutional elements.  *See* J.A.1483-1486.

**III.**    Whether the district court had subject-matter jurisdiction because Plaintiffs' claims for injuries allegedly stemming from global climate change necessarily and exclusively arise under federal law.  *See* J.A.1472-1473.

**IV.**    Whether Plaintiffs' claims "aris[e] out of, or in connection with" Defendants' operations on the Outer Continental Shelf ("OCS"), 43 U.S.C. § 1349(b)(1).  *See* J.A.1472-1473.[2]

[An addendum of key statutory provisions is included at the end of the brief.]

## STATEMENT OF THE CASE

**I.**    Plaintiffs, Anne Arundel County and the City of Annapolis, each filed suit in state court, alleging that "the normal or foreseeable use of [Defendants'] fossil fuel products . . . was a direct and proximate cause of [Plaintiffs'] injuries and a substantial factor in the harms suffered by [Plaintiffs]."  J.A.696; J.A.1457.  According to Plaintiffs, Defendants'

---

[2] *Baltimore IV* decided the third and fourth issues, but Defendants respectfully preserve them for further review.

extraction, production, marketing, and sale of their oil and gas "have con-tributed substantially to the buildup of $CO_2$ in the atmosphere that drives global warming and its physical, environmental, and socioeconomic con-sequences." J.A.543; J.A.1299. Plaintiffs allege that these environmen-tal changes "have led to increased property damage, economic injuries, and impacts to public health," requiring them to spend "significant funds to mitigate and adapt to the effects of global warming." J.A.1305; *accord* J.A.548. Plaintiffs assert causes of action for public and private nuisance, trespass, strict liability for failure to warn, negligent failure to warn, and violations of Maryland's Consumer Protection Act. J.A.684-702; J.A.1445-1464. Plaintiffs demand, among other things, compensatory and punitive damages, disgorgement of profits, and equitable relief to abate the alleged nuisances. J.A.703; J.A.1464.

II.    Defendants are 25 energy companies, as well as a trade or-ganization, that have produced and sold fossil fuels for many decades. Nearly all of the relevant conduct alleged by Plaintiffs occurred outside of Maryland, with a significant portion occurring in foreign countries or on federal land, including the OCS. J.A.550; J.A.1307; J.A.561; J.A.1319; J.A.634; J.A.1392. Certain Defendants also engaged in extensive fossil-

fuel production at the direction of federal officers. *See*, *e.g.*, J.A.92-99; J.A.748-755.

Defendants' notices of removal raised various grounds for removal, including that Plaintiffs' Complaints: (1) allege actions taken pursuant to a federal officer's directions; (2) "raise[] disputed and substantial federal questions"; (3) arise under federal common law because federal law necessarily and exclusively governs claims for interstate and international pollution; and (4) warrant federal jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349. J.A.16-18; J.A.721-723.

The district court granted Plaintiffs' motions to remand, rejecting Defendants' bases for removal. J.A.1486-1487. The district court concluded that most bases for removal were foreclosed by *Baltimore IV*, which had affirmed remand of similar climate change-related claims in another case. J.A.1473. With respect to federal officer removal, the court determined that Defendants failed to plausibly assert that the alleged misrepresentations and failure to warn highlighted in Plaintiffs' Complaints were carried out for or in relation to official authority. J.A.1476-1481. Reasoning that the expanded factual record that Defendants

presented in this case—relative to the record in *Baltimore IV*—did not address this legal issue, the court rejected federal officer removal. J.A.1483. The district court also rejected *Grable* jurisdiction, concluding that Plaintiffs' asserted state-law tort claims do not "necessarily raise" First Amendment issues. J.A.1483-1486.

**III.** On October 11, 2022, Defendants timely noticed their appeals, J.A.1489; J.A.1507, and moved to stay execution of the remand orders, No. 21-cv-01323, ECF No. 155; No. 21-cv-00772, ECF No. 178. The district court entered an order granting in part and denying in part Defendants' motion, "stay[ing] . . . the remand order . . . until further notice," and instructing the parties to "keep th[e] Court apprised of relevant updates in the related cases before the United States Supreme Court," including that Court's call for the Solicitor General to file a brief expressing the views of the United States on the questions presented in the *Suncor* petition. No. 21-cv-01323, ECF No. 161; No. 21-cv-00772, ECF No. 184.

## STANDARD OF REVIEW

This Court "review[s] de novo issues of subject matter jurisdiction, including removal." *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209 (4th Cir. 2016).

## SUMMARY OF THE ARGUMENT

**I.**    The district court erred in holding that Plaintiffs' claims were not removable under the federal officer removal statute, 28 U.S.C. § 1442(a).

The district court assumed that it was bound by this Court's decision in *Baltimore IV*, but the defendants in that case did not raise—and therefore the Court in *Baltimore IV* did not confront—several arguments that Defendants assert here.  Defendants here have presented a much more extensive evidentiary record than existed in *Baltimore IV*.  Defendants have presented evidence of new categories of activities undertaken at the direction of federal officers—such as the production of large amounts of specialized, noncommercial grade fuels for the U.S. military, which must meet detailed specifications to fulfill unique military needs— that the Court in *Baltimore IV* had no occasion to consider.  This expanded record demonstrates that Defendants' acts under the direction of federal officers were pervasive and not too attenuated from Plaintiffs' claims.  *See Baltimore IV*, 31 F.4th at 230-32, 234.  Moreover, the expanded record here has cured the purported evidentiary deficiencies the

Court in *Baltimore IV* identified as preventing it from concluding that the defendants there acted under federal officers.

Defendants here also present a legal argument that was not presented to or considered by the Court in *Baltimore IV*. The *Baltimore IV* Court held that federal officer removal was improper because, in its view, the defendants' production and sale of fossil fuels under the direction of federal officers were too attenuated from the defendants' alleged misrepresentations. But under the federal officer removal statute, the "relatedness" analysis is not limited to a plaintiff's theory of liability or to particular conduct that the plaintiff chooses to highlight. Rather, courts must focus on the nature of the plaintiff's theory of *injury*. Here, Plaintiffs have alleged physical injuries stemming from global climate change which, they contend, necessarily resulted in part from Defendants' production and sale of fossil fuels. Because a substantial portion of those production and sale activities were undertaken at the direction of federal officers, removal here is appropriate to ensure Defendants' right to a federal forum. The court below incorrectly assumed that *Baltimore IV* foreclosed this argument.

11

Because Plaintiffs' claims necessarily relate to these federal-officer-directed activities, these cases are removable under Section 1442(a).

**II.** Plaintiffs' claims also raise substantial, disputed issues of federal law, making removal appropriate under *Grable*. Plaintiffs' allegations of disinformation campaigns target constitutionally protected speech and therefore necessarily require Plaintiffs to prove affirmative federal-law elements imposed by the First Amendment. Their claims thus include substantial federal questions that provide the basis for *Grable* removal.

**III.** Finally, Defendants respectfully preserve their arguments that Plaintiffs' claims arise under federal law because federal law necessarily and exclusively governs claims seeking relief for harms allegedly stemming from interstate and international pollution; that they raise and depend on the resolution of disputed, substantial federal questions and are therefore removable under *Grable*; and that they arise out of, or in connection with, operations on the OCS.

## ARGUMENT

## I.    These Actions Are Removable Under The Federal Officer Removal Statute.

The federal officer removal statute provides for removal of suits brought against any person acting under a federal officer whenever the "civil action" is "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). When Congress inserted the words "or relating to" into the Removal Clarification Act of 2011, this Court abandoned "the old 'causal nexus' test," such that a removing defendant need show only "a connection or association between the act in question and the federal office." *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 256 (4th Cir. 2021). Federal officer removal is thus proper when (1) the defendant acted under a federal officer; (2) the plaintiff's civil action is "for or relating to"—*i.e.*, connected or associated with—that act; and (3) the defendant can assert a colorable federal defense. *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017). In assessing whether the facts of the case meet this standard, courts must "credit [the defendant's] theory of the case" and liberally construe matters in favor of the federal forum. *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999).

Because "the federal officer removal statute must be 'liberally construed,'" "the ordinary 'presumption against removal' does not apply." *Express Scripts*, 996 F.3d at 250-51 (quoting *Mayor & City Council of Baltimore v. BP P.L.C.*, 952 F.3d 452, 461 (4th Cir. 2020) ("*Baltimore II*")) (other citations omitted). To establish removal jurisdiction, Defendants' removal allegations need only be plausible, and courts must draw all reasonable inferences in favor of the defendants. *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941, 945 (7th Cir. 2020). Moreover, "removal need not be justified as to all claims asserted in the plaintiffs' complaint"—one claim is enough. *Sawyer*, 860 F.3d at 257.

Here, Plaintiffs seek relief for alleged physical injuries purportedly resulting, in part, from actions that Defendants took under the direction, guidance, and control of federal officers. Under the applicable liberal pleading standards, Defendants have established that their actions under federal officers relate to Plaintiffs' claims and have pleaded colorable federal defenses.

The district court, however, assumed that it was bound by *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022) ("*Baltimore IV*"), to remand these suits to state court. That was incorrect.

14

Defendants have raised new arguments that were not presented to or passed upon by the Court in *Baltimore IV*. Defendants have also presented new evidence that the Court in *Baltimore IV* did not consider, including evidence that fully addresses purported evidentiary gaps identified by *Baltimore IV*.

### A. Defendants' extraction, production, and sales activities under federal officers "relat[e] to" Plaintiffs' civil action.

Defendants' production of oil and gas is central to Plaintiffs' civil actions, which allege injuries from global greenhouse gas emissions. First, Defendants' notices of removal in the present cases included extensive new evidence—which was not before the Court in *Baltimore IV*—making clear that federal officers directed Defendants' extraction, production, and sale of significant volumes of oil and gas. Moreover, under Plaintiffs' own theory, their alleged physical injuries arise in part from Defendants' production of fossil fuels, meaning that those activities directed by federal officers necessarily relate to Plaintiffs' suits.

1.  **Defendants' new evidence demonstrates that their oil and gas activities under federal direction were substantial and pervasive such that they necessarily relate to Plaintiffs' lawsuits.**

The district court did not consider the merits of any of Defendants' arguments or evidence demonstrating that they acted under federal officers.  Instead, the district court assumed that it was bound by *Baltimore IV* to reject federal officer removal.  J.A.1481-1483.

In so ruling, the district court misapplied *Baltimore IV* by ignoring the new evidence of Defendants' extensive "production and sale" of fossil fuels under the direction of federal officials, which the *Baltimore IV* Court considered "relevant to the nexus analysis."  31 F.4th at 234.  There, the Court affirmed the district court's conclusion that the defendants failed to establish the requisite nexus, in part because a federal officer did not "control [defendants'] total production and sales of fossil fuels."  *Id.* at 233.

The new record evidence in this appeal makes clear that there was pervasive federal control over much of Defendants' production and sales activities.  The expanded records in these cases include evidence of Defendants' (i) producing specialized fuels for the military, (ii) acting under the direction of the military during World War II and the Korean War,

16

and (iii) supplying oil to the Strategic Petroleum Reserve ("SPR"). *See infra* at 32-44. For example, Defendants have demonstrated that for decades they have produced and supplied large quantities of specialized fuels in conformity with precise Department of Defense ("DOD") specifications to meet the unique operational needs of the military's planes, ships, and other vehicles. J.A.92-99; 748-755. And several Defendants have historically provided a range of bespoke petroleum-based products for the military, including JP-5 fuel for the Navy and JP-8 fuel for the Air Force and Army. J.A.93-96; J.A.749-772. Indeed, DOD annually is the largest consumer of energy in the United States and one of the world's largest users of petroleum fuel. J.A.93; J.A.749. As two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and during their tenures, petroleum products were "crucial to the success of the armed forces." J.A.420-421; J.A.1050-1051.

The record here also addresses specific areas identified by the *Baltimore IV* Court as needing additional factual development, including new evidence that Defendants acted under federal officers in performing

17

operations on the OCS to fulfill basic government duties that the federal government otherwise would have needed to perform itself, J.A.271-278; J.A.856-863, and new evidence, including declassified documents, that Standard Oil, a predecessor of Defendant Chevron, acted under federal officers by operating the Elk Hills reserve under the control of the U.S. Navy, and that Standard Oil was "*in the employ* of the Navy Department and [was] responsible to the Secretary thereof," J.A.76; J.A.778; *see infra* at 44-54.

These new categories of evidence demonstrate a thoroughgoing relationship between Defendants' actions allegedly giving rise to Plaintiffs' injuries and Defendants' actions under federal control, filling the exact gaps that the *Baltimore IV* Court identified as "diminish[ing]" the nexus between Plaintiffs' claims and Defendants' federal actions. 31 F.4th at 234. Thus, in contrast to the *Baltimore IV* Court's assessment of the limited record before it, the specific evidence here establishes a connection between Defendants' extensive activities taken under federal control and Plaintiffs' claims.

### 2. Defendants' federal activities necessarily relate to Plaintiffs' alleged physical injuries.

Additionally, the Court in *Baltimore IV* never confronted Defendants' legal argument here: namely, that Plaintiffs' "civil action[s]" necessarily "relat[e] to" Defendants' alleged extraction and production of fossil fuels, 28 U.S.C. § 1442(a)(1), because Plaintiffs' claimed *injuries* were allegedly caused in part by Defendants' production and sale of oil and gas, substantial amounts of which occurred under the direction of federal officers.

**a.** *Baltimore IV* held that federal officer removal was improper because defendants' production and sale of fossil-fuel products was too attenuated from "the charged conduct" on which the plaintiff purported to focus, that is, the defendants' alleged "disinformation campaign." 31 F.4th at 233-34. The *Baltimore IV* Court, however, did not consider Defendants' antecedent argument here: that in applying the federal officer removal statute's relatedness inquiry, courts must consider whether the defendant's federally directed acts relate to the plaintiff's alleged *injury*.

Here, Defendants' argument is that Plaintiffs seek relief for physical injuries that Plaintiffs allege were caused by global climate change and have sued Defendants on the ground that they are major producers

of fossil fuels. Defendants argued below that their extraction and production of fossil fuels, a substantial amount of which occurred under the direction of federal officers, necessarily forms an essential element of Plaintiffs' chain of injury causation, and therefore must relate to Plaintiffs' "civil action." 28 U.S.C. § 1442(a). That argument has not yet been considered and decided by this Court, *see United States v. Norman*, 935 F.3d 232, 240 (4th Cir. 2019) (stare decisis does not apply when prior court "never squarely addressed the issue" but instead simply "assumed" it (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993))), and it is squarely presented here. This Court should decide this jurisdictional question, particularly given federal courts' "virtually unflagging obligation" to decide cases within their jurisdiction. *VonRosenberg v. Lawrence*, 781 F.3d 731, 734 (4th Cir. 2015) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-18 (1976)).

**b.** Federal officer removal is proper whenever a plaintiff's "civil action . . . relat[es]"—at least in part—to the defendant's action(s) under the direction of federal officers. 28 U.S.C. § 1442(a)(1); *see also Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc) (the statute "plainly expresses that a civil action relating to an act under

20

color of federal office may be removed" (emphasis omitted)). The district court assumed that in defining the "civil action" in a given case, courts should focus on "the alleged tortious conduct" that the plaintiff has emphasized. J.A.1482. But this Court rightly focuses instead on the acts that allegedly caused the "injuries" and on the "harm" that allegedly gave rise to the "damages" that the plaintiff seeks to recover. *Express Scripts*, 996 F.3d at 251-52 (quoting *Sawyer*, 860 F.3d at 255). As the Seventh Circuit has explained in this context, courts must examine how and when the plaintiff's alleged "injury occurred." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012).

This is the same analysis that courts apply to a wide range of jurisdictional inquiries. When assessing the nature of a plaintiff's claims, the Supreme Court has explained that courts must "zero[] in on the core of the[] suit," especially the "acts that actually injured" the plaintiff. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015); *see also id.* at 36 ("[T]he 'essentials' of a personal injury narrative will be found at the 'point of contact'—'the place where the boy got his fingers pinched.'"); *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1222 (11th Cir. 2018) (focusing on the "'acts that actually injured' the plaintiff"

21

as "the 'core' of the suit"). This Court, too, has made clear that the jurisdictional analysis focuses on the acts that the "asserted injuries alleged in the complaint flow from." *France.com, Inc. v. French Republic*, 992 F.3d 248, 253 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 712 (2021).

This test is essential because "any other approach would allow plaintiffs to evade" jurisdictional requirements "through artful pleading." *Sachs*, 577 U.S. at 36; *see also Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 169 (2017) (courts should "set[] aside any attempts at artful pleading"). The analysis prevents a plaintiff from framing a complaint to skip over foundational tortious conduct for jurisdictional purposes, or—as here— adding allegations that camouflage the crux of the "civil action." 28 U.S.C. § 1442(a).

**c.** Here, a necessary and central element of Plaintiffs' alleged injuries is the production, sale, and use of oil and gas. Defendants' production activities under the direction of the federal government, and the government's subsequent use of vast quantities of fossil fuels, thus form an essential part of Plaintiffs' claims. Indeed, the Court in *Baltimore IV* recognized that the defendants' fossil-fuel production "is necessary to establish the avenue of Baltimore's climate-change-related injuries," 31 F.4th

at 233, even though the Court did not have occasion to consider the dispositive impact of that fact for federal jurisdiction.

The Complaints here rely on the harms allegedly wrought by the increased consumption of Defendants' oil-and-gas products and the resulting emissions, which Plaintiffs allege drove climate change and caused them physical injury. J.A.545; J.A.1302. Plaintiffs expressly allege that "Defendants' fossil fuel products are the primary driver of global warming," and "the resultant dangers to the environment," including Plaintiffs' alleged injuries. J.A.648; J.A.1406; J.A.672; J.A.1431; *see also* J.A.541; J.A.1297 ("pollution from *Defendants' fossil fuel products* plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution," which "is *the main driver* of" the climate change that Plaintiffs allege caused their injuries (emphases added)). Plaintiffs also allege that the cumulative impact of Defendants' overall "extraction," "refining," "marketing," and "placement of . . . fossil fuel products in the stream of commerce" over the past several decades contributed to the global greenhouse gas emissions that Plaintiffs claim caused their alleged injuries. J.A.684; J.A.1446. Indeed, the Complaints are replete with references to Defendants' production and sales and their

alleged impacts. *See*, *e.g.*, J.A.548-549; J.A.1306; J.A.612; J.A.1370; J.A.697; J.A.1458-1459. The Complaints do not plead that Plaintiffs are injured solely by Defendants' purported "concealment of the known hazards [of fossil fuels]," J.A.545; J.A.1302, but rather by virtue of phenomena like rising sea levels that are—in Plaintiffs' account—artifacts of worldwide fossil-fuel production and emissions, not of speech or omissions about climate change. Plaintiffs' Complaints thus put Defendants' production, promotion, and sales activities—not just their alleged misrepresentations—front and center by seeking to hold Defendants at least partially responsible for climate change and for Plaintiffs' alleged physical injuries purportedly resulting therefrom.

This connection is particularly evident in Plaintiffs' property-based causes of action: trespass, public nuisance, and private nuisance. J.A.684-698; J.A.1445-1460. Misrepresentation is not traditionally an element of these claims at all. Rather, each claim rests on allegations that Plaintiffs suffered physical injuries from Defendants' extracting, refining, and selling of fossil fuel. J.A.540-541; J.A.684-685; J.A.692-693; J.A.697; J.A.1296-1297; J.A.1446; J.A.1454; J.A.1458-1459; *see also Rosenblatt v. Exxon Co., U.S.A.*, 642 A.2d 180, 189 (Md. 1994) (trespass

24

occurs by defendant "causing something to enter [the plaintiff's] land");
*Schuman v. Greenbelt Homes, Inc.*, 69 A.3d 512, 520 (Md. Ct. Spec. App.
2013) ("A nuisance is an interference with the enjoyment of one's prop-
erty.").

Even with regard to Plaintiffs' claims for failure to warn and viola-
tion of the Maryland Consumer Protection Act, Plaintiffs necessarily rely
on Defendants' extraction, production, and sale of oil and gas, whose com-
bustion and resulting emissions allegedly led to Plaintiffs' injuries and
are thus essential to their claims.  Under those purported causes of ac-
tion, Plaintiffs still must prove that they suffered injuries—here, the al-
leged harms from Defendants' extracting, refining, and selling fossil fuel.
*See Gourdine v. Crews*, 405 Md. 722, 738 (2008) (to establish failure to
warn claim, plaintiff must show "actual injury or loss"); *Citaramanis v.
Hallowell*, 613 A.2d 964, 969 (Md. 1992) (to sue under Maryland Con-
sumer Protection Act, plaintiff must "establish the nature of the actual
injury or loss that he or she has allegedly sustained as a result of the
prohibited practice").

Plaintiffs' singular focus in their briefing below on Defendants' al-
leged misstatements "does not change the substance of [their] claims."

25

*City of New York v. Chevron Corp.*, 993 F.3d 81, 97 (2d Cir. 2021). Addressing a substantially similar climate-change suit, the Second Circuit rejected an argument similar to the one credited by the district court below. The Second Circuit held that the City of New York could not "focus on" one particular "'moment' in the global warming lifecycle" to "artful[ly] plead[]" its case. *Id*. In the same way, Plaintiffs here cannot wave away the production and sale of fossil fuels—a necessary link in their theory of causation—to focus only on Defendants' alleged statements and omissions. *See France.com*, 992 F.3d at 252.

Nor does it matter that Plaintiffs claim that Defendants' alleged misrepresentations—which were not undertaken at the direction of federal officers—indirectly contributed to global climate change and thus to Plaintiffs' alleged injuries. As the Seventh Circuit has explained, for purposes of federal-officer removal, all that is required is that "a small, yet significant, portion of [defendants'] relevant conduct" be for or related to federal authority. *Baker*, 962 F.3d at 945 (emphasis omitted) ("de minimis" standard satisfied when defendant "operated under government commands for [5-15%] of the relevant time span"). This Court recognized the same principle in *Express Scripts*, holding that removal was proper

26

even though only a fraction of the opioids supplied by the defendants that allegedly caused a public nuisance were supplied under federal direction or control. 996 F.3d at 257 ("Arlington's claim . . . necessarily includes activity that is directly connected to the DOD contract"). Indeed, just as plaintiff's claims in *Express Scripts* sought "monetary damages due to harm arising from 'every opioid prescription' filled by pharmacies," *id.*, so here Plaintiffs seek damages due to harm allegedly arising from emissions released by all of Defendants' oil and gas products that were combusted, *see, e.g.*, J.A.548-549; J.A.1306 ("Defendants are responsible for a substantial portion of the total greenhouse gases emitted since 1965 . . . [and] bear a dominant responsibility for global warming, and for [Plaintiffs'] injuries in particular."). The relevant standard is not that Plaintiffs' injuries arise *only* from Defendants' actions at the direction of a federal officer. Rather, Section 1442(a) must be construed liberally. *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Here, the necessary implication of Plaintiffs' allegations is that Defendants' actions under federal officers constitute far more than a "de minimis" fraction of their "relevant conduct"—the production, sale, and emissions that Plaintiffs allege injured them. *Baker*, 962 F.3d at 945; *see also Acker*, 527 U.S. at

27

432 (requiring that courts "credit [a removing defendant's] theory of the case").

Thus, even if it were true that, as the district court believed, Defendants' only allegedly "tortious conduct" is their alleged "campaigns . . . [of] concealment and misinformation," J.A.1472, the fact remains that Plaintiffs' claimed injuries—as well as their causes of action and the relief that they seek—bear a "relation" to the production, sale, and use of Defendants' oil and gas products, much of which occurred at the direction of federal officers. That is sufficient to confer jurisdiction under § 1442(a)(1).

### B. Plaintiffs' attempted disclaimer fails.

The district court also considered itself bound by Plaintiffs' attempt to disclaim "injuries arising on federal property" and those arising from "special-formula fossil-fuel products that Defendants designed specifically for, and provided exclusively to, the federal government for use by the military." J.A.1482; *see also* J.A.545; J.A.1302. The court found that this "disclaimer further distances the alleged misconduct from the purported federal authority." J.A.1482. But Plaintiffs' misguided effort to use a purported disclaimer fails, and is not an issue that was considered

28

or ruled on in *Baltimore IV*. Plaintiffs' allegations stem from the total accumulation of all greenhouse gas emissions and, as Plaintiffs concede, "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources." *See, e.g.*, J.A.698; J.A.1453; *see also Express Scripts*, 996 F.3d at 257. Thus, regardless of any disclaimer, Plaintiffs necessarily *do* seek recompense for injuries allegedly arising, at least in part, from Defendants' activities in producing and selling fossil fuels at the behest of the federal government.[3]

In *Express Scripts*, this Court rejected precisely this sort of attempt to artfully plead around an injury caused in part by acts defendants took at the behest of federal officers. *See* 996 F.3d at 256-57. In that case, Arlington County sued pharmacies in state court asserting that they bore responsibility for the opioid epidemic because they knowingly oversupplied opioids to patients. *Id.* at 247-48. Some defendants, which operated mail-order pharmacies for the DOD, removed the action under the federal officer removal statute. *Id.* at 248-49. This Court upheld removal.

---

[3] Notably, Plaintiffs' purported disclaimer fails even on its own terms, as it addresses only a portion of Defendants' activities conducted at the direction of the federal government.

Arlington argued that its claims did not arise from the defendants' federal activities because the "[c]omplaint did not even mention the distribution of opioids to veterans, the [defendants'] DOD contract or the [defendants'] operation of the [federal program]." *Id.* at 256-57. But this Court rejected that position as "elevat[ing] form over substance"; it explained that "Arlington's claims seek monetary damages due to harm arising from 'every opioid prescription' filled by pharmacies" such as the defendants'. *Id.* This Court refused to let Arlington artificially segregate out part of an indivisible injury to avoid federal jurisdiction. The same prohibition on artful pleading applies here, where Plaintiffs seek to hold Defendants liable for harm allegedly arising from every molecule of carbon dioxide emitted over decades.

Similarly, as the Seventh Circuit explained in rejecting a similar disclaimer, when plaintiffs allege that a certain product "harmed them," they cannot "have it both ways" by "purport[ing] to disclaim" that their lawsuit includes the defendant's "manufacture of [that product] for the government." *Baker*, 962 F.3d at 945 n.3. Rather, "[t]his is just another example of a difficult causation question that a federal court should be the one to resolve." *Id*. The same is true here. Plaintiffs have not

30

disclaimed any legal theory or amount of damages against any Defendant—they are seeking all damages they have purportedly suffered from the adverse effects of climate change. And whether or not Defendants' activities undertaken at the direction of federal officers caused Plaintiffs' alleged harm is a merits question that should be resolved in federal court. Whether the plaintiffs' "injuries flowed from the Companies' specific wartime production for the federal government or from their more general manufacturing operations" are "merits questions that a federal court should decide." *Id.* at 944 (emphasis omitted).

Accepting Plaintiffs' selective disclaimers would allow them to strategically ignore whole swaths of their Complaints. *See*, *e.g.*, *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 n.6 (D. Mass. 2008) (rejecting attempt to disclaim "recovery for any injuries resulting from" acts "committed at the direction of an officer of the United States Government"); *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *2 (N.D. Cal. June 22, 2007) ("[T]he fact that Plaintiffs' complaint expressly disavows any federal claims is not determinative."). Ultimately, the question whether "Plaintiffs' injuries occurred . . . under color of federal office" is

31

"for federal—not state—courts to answer." *Nessel v. Chemguard, Inc.*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021).

## C.    Defendants acted under federal officers.

The Supreme Court has explained that, for private persons to qualify as "acting under [a federal] officer," 28 U.S.C. § 1442(a)(1), the assistance provided by the contractor must "help[] officers fulfill . . . basic governmental tasks." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153-54 (2007). Such "basic governmental tasks" include those jobs that, "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id*.

The record here, which includes both different allegations than in *Baltimore IV* and new evidence not considered by that Court, satisfies that standard.

### 1.    Defendants presented evidence of new categories of actions under federal officers.

In their notices of removal, Defendants demonstrated that they acted under federal officers in three ways not presented to the *Baltimore IV* Court: (i) producing specialized fuels for the military, (ii) acting under the direction of the military during World War II and the Korean War, and (iii) supplying oil to the Strategic Petroleum Reserve ("SPR"). Each

32

of those actions independently establishes that Defendants acted under federal officers.

> **(a)** **Defendants acted under federal officers to produce and supply specialized fuels for the military.**

Federal officer removal is appropriate when a contractor manufactures specialized products for the government. *See Sawyer*, 860 F.3d at 255. Many Defendants here did just that, developing and providing specialized fuels to the military under government contracts and direction.[4]

For decades, Defendants have produced and supplied large quantities of specialized fuels in conformity with exact DOD specifications to meet the unique operational needs of the military's planes, ships, and other vehicles. J.A.92-99; J.A.748-755. Defendants (or their predecessors or affiliates) Shell Oil Company, BP, ExxonMobil, and subsidiaries of Tesoro Corporation ("Tesoro"), which is now a subsidiary of Marathon

---

[4] The Complaints improperly conflate the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. *See*, *e.g.*, J.A.549-577; J.A.1307-1335. Defendants reject Plaintiffs' attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants. For purposes of litigating this appeal, however, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that Plaintiffs' Complaints, as pleaded, were properly removed to federal court.

33

Petroleum Corporation, for example, have historically provided a range of bespoke petroleum-based products for the military, including JP-5 fuel for the Navy and JP-8 fuel for the Air Force and Army. J.A.94-98; J.A.749-755. And this production is far from incidental or marginal: DOD annually is the largest consumer of energy in the United States and one of the world's largest users of petroleum fuel. J.A.93; J.A.749. In 2019 alone, DOD procured 94.2 million barrels of fuel products in compliance with military specifications, worth more than $12 billion. J.A.89; J.A.790-791.

To fulfill the government's orders, Defendants followed "detailed military specifications concerning performance, fuel chemistry, testing, and inspection." J.A.180; J.A.1200. Defendants did not merely supply "standardized consumer product[s]" to the military. *Express Scripts*, 996 F.3d at 251 (alteration in original) (quoting *Baltimore II*, 952 F.3d at 464). Rather, they created custom products to satisfy the military's demand for "specific freezing points, flash points, viscosity, and tolerance of high temperatures." J.A.180; J.A.1200. Some specifications span dozens of pages. *See*, *e.g.*, J.A.492-533; J.A.1123-1164; J.A.442-470; J.A.1072-1100; J.A.472-490; J.A.1102-1121. Those specifications are

34

fundamentally different from the "quality assurance" provisions that *Baltimore IV* concluded were insufficient because they were "typical of any commercial contract." 31 F.4th at 231. Rather, they are like the specifications for the production of Agent Orange—setting forth the chemical composition and purity of a custom product—that *Baltimore IV* considered the hallmark of "close supervision." *Id*. The government's specifications thus establish federal control over Defendants' production of customized fuels.

Those customized fuels allowed crucial military and intelligence programs to operate. For example, during the Cold War, Shell Oil Company developed and produced specialized jet fuel for the federal government to meet the unique performance requirements of the U-2 and later the OXCART and SR-71 Blackbird spy plane programs. J.A.94-95; J.A.749-751. And during World War II, Defendants produced huge quantities of specialized, high-octane fuel for planes, known as avgas, that was critical to the Allies' war effort. *See Shell Oil Co. v. United States*, 751 F.3d 1282, 1285-86 (Fed. Cir. 2014).

To this day, Defendants continue to supply DOD with highly specialized fuels to power planes, ships, and other vehicles, and to satisfy

35

national-defense requirements.  For example, between 1983 and 2011, subsidiaries of Tesoro, which is now a Marathon Petroleum Corporation subsidiary, entered into at least 15 contracts with the DOD Defense Logistics Agency to supply highly specialized military jet fuels, such as JP-4, JP-5, and JP-8.  J.A.95-99; J.A.751-755.  These contracts required Tesoro to produce and deliver custom products to the military in line with exacting specifications.  Those specifications establish federal control over Defendants' production activities—activities in which Defendants stood in for the federal government to perform basic governmental functions.

Without Defendants' work as contractors, the government would have had to produce these fuels itself.  As early as World War II, the government recognized that "[a]n army no longer marches on its stomach: an army marches, a navy sails, and an air force flies on oil."  J.A.391; J.A.976.  These fuels have long been vital to the military effort.

Indeed, if the United States did not obtain specialized oil and gas from the oil industry for military purposes, it would have had to produce it on its own.  For federal officers, ensuring the national defense is a constitutional requirement, not a discretionary option.  *See The Prize Cases*,

67 U.S. (2 Black) 635, 668 (1863). After December 7, 1941, the United States government had no practical alternative but to obtain oil to fuel the war against the Axis Powers. It could have nationalized the oil industry to do so. *See*, *e.g.*, J.A.402-405; J.A.1032-1035. Instead, it largely relied on industry to "fulfill a basic governmental task, under the government's control or subjection, that the government would otherwise have to perform itself." *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 301-02 (4th Cir. 2022).

Similarly, before the age of spy satellites, the United States government needed to fuel specialized reconnaissance planes in order to monitor Soviet activities. *Cf.* Serhii Plokhy, *Nuclear Folly: A History of the Cuban Missile Crisis* 129-31 (2021) (explaining how a pause in U-2 overflights of Cuba allowed the Soviet Union to construct nuclear missile bases undetected). In the absence of private industry producing specialized fuels for these reconnaissance planes, the government would have needed to find a way to fuel the national defense itself.

In supplying specialized fuel to the military pursuant to detailed specifications, Defendants enabled the federal government to perform a vital function. Defendants therefore acted under federal officers.

### (b)  Defendants acted under federal officers during World War II and the Korean War.

The federal government exerted extraordinary control over Defendants during World War II and the Korean War to guarantee fuel supplies for wartime efforts.  Federal control of the industry was pervasive.  "The government not only directed and controlled production, but also financed and owned a substantial proportion of the industry's productive capacity."  J.A.155; J.A.1175.  In light of that control, the "petroleum industry . . . was, without the slightest doubt, one of the most effective arms of this Government in fulfilling the government's core defense functions," according to Senator Joseph O'Mahoney, chair of a Senate Select Committee on Petroleum Resources.  J.A.429 (emphasis and internal quotation marks omitted); *accord* J.A.1059.

During World War II, the Petroleum Administration for War ("PAW") directed construction of new oil exploration and petroleum-products manufacturing facilities, dictated the allocation of raw materials, and decreed production orders.  J.A.85-87; J.A.787-789.  Over the course of the war, PAW exercised control over the industry by issuing a total of 80 "recommendations" and directives.  J.A.157-158; J.A.1177-1178.  "PAW instructed the oil industry about exactly which products to

produce, how to produce them, and where to deliver them." J.A.86; J.A.788. Those directives were mandatory and enforceable by law. J.A.87; J.A.788-789. PAW's message to the oil and gas industry was clear: the government would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way." J.A.87 (quoting Interior Secretary Harold Ickes, Conference of Petroleum Industry Chairmen 8 (Aug. 11, 1941)); *accord* J.A.788. PAW also imposed "disciplinary measures" to prevent noncompliance by Defendants, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance." J.A.87; *accord* J.A.788. And PAW retained the ultimate authority to commandeer industry if industry failed to comply with PAW's directives. J.A.159; J.A.1179. Taken together, these measures demonstrate the extraordinary power PAW wielded over Defendants during the war.

As part of its wartime efforts, the federal government entered into contracts with predecessors or affiliates of Defendants Chevron, Shell Oil Company, and ExxonMobil to obtain "vast quantities of avgas." *Shell*, 751 F.3d at 1286. Avgas "was the most critically needed refinery product

during World War II and was essential to the United States' war effort." *Id.* at 1285 (internal quotation marks omitted).

These contracts provided federal officers with the power to direct the operations of Defendants. The contract with Shell Oil Company's predecessor or affiliate, for instance, specified working "day and night" to expand facilities producing avgas "as soon as possible and not later than August 1, 1943." J.A.91; J.A.793. And the federal government controlled "how and when" ExxonMobil and its affiliates "use[d] raw materials and labor." J.A.92; *accord* J.A.793-794. Defendants' wartime provision of avgas is a "classic case" of "when [a] private contractor acted under a federal officer or agency because the contractors helped the Government to produce an item that it needed." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (cleaned up) (discussing Boeing's work under a federal contract to produce a military aircraft).

During World War II, Defendants also acted under the federal government by operating and managing government-owned petroleum production facilities, domestically producing approximately 80% of the seven billion barrels of crude oil needed to support the U.S. war effort. J.A.92; J.A.748. The government also built twenty-nine specialized avgas

40

production facilities, which private companies operated under government control. J.A.166; J.A.1186. For example, Chevron's predecessor Standard Oil of California ("Socal") operated an avgas refinery in Richmond, California. The government owned nearly 85% of the equipment at the plant, and Socal operated it on behalf of the government. J.A.168; J.A.1188. Similarly, BP's predecessor, Standard Oil Co. of Indiana, operated an avgas facility in Salt Lake City, which was more than 96% government owned. J.A.169; J.A.1189. In operating those facilities, Defendants stood in the shoes of the federal government.

Similarly, Defendants acted under federal officers by building and operating pipelines and by transporting oil. A consortium of oil companies built two vital pipelines between Texas and Illinois, respectively, and the Eastern Seaboard. J.A.159-161; J.A.1179-1181. The government paid for and owned both of the pipelines; industry served as a mere contractor to construct, supply, and operate them. J.A.159-161; J.A.1179-1181.

The intimate relationship between Defendants and the military did not end in 1945. At the start of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD")

41

under authority of the Defense Production Act of 1950, Pub. L. No. 81-774, 64 Stat. 798.  PAD issued orders to Defendants to produce avgas. J.A.102; J.A.796-707.  And it required oil companies to expand production, "calling on the industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952."  J.A.102; *accord* J.A.796-797.  Thus, during the Korean War, Defendants continued to work under the direction of federal officers.

Without Defendants' work as contractors, the government itself would have needed to produce oil and gas, including various specialized fuels.  Indeed, "responsibility for victory" in World War II rested on the American oil industry.  J.A.156 (quoting U.S. War Production Board leader Charles E. Wilson, *in* Gerald D. Nash, *United States Oil Policy, 1890-1964: Business and Government in Twentieth-Century America* 158 (1968)); *accord* J.A.1176.  Because Defendants stood in for federal officers to perform vital governmental functions under strict governmental control, their actions during the Second World War and the Korean War establish a basis for federal officer removal jurisdiction.  *See Watson*, 551 U.S. at 152 ("the private person's 'acting under' must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior").

42

### (c) Defendants supplied oil directly to the government and managed the Strategic Petroleum Reserve under federal officers.

In response to the 1970s oil embargoes, Congress created the SPR in the 1975 Energy Policy and Conservation Act, Pub. L. No. 94-163, 89 Stat. 871, to meet its treaty obligations under the 1974 Agreement on an International Energy Program and to blunt the future use of petroleum as a weapon by foreign countries. J.A.79 (citing H.R. Rep. No. 115-965, at 3 (2017)); *accord* J.A.781. Defendants "acted under" federal officers by supplying oil for and managing the SPR on behalf of the government.

The federal government required certain Defendants, as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile. J.A.81; J.A.782-783. The government contracted for delivery of millions of barrels of oil for delivery to the SPR. J.A.81; J.A.782-783. Some Defendants also acted under federal officers as operators and lessees of SPR infrastructure. For example, Shell Oil Company's affiliates operated the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana on behalf of the federal government. J.A.81-82; J.A.783-784. An Exxon affiliate has also operated SPR infrastructure. J.A.82; J.A.783-784.

43

The SPR subjects Defendants to the federal government's supervision and control, including in case the President calls for an emergency drawdown. J.A.82; J.A.784; *see also* 42 U.S.C. § 6241(d)(1). Such a drawdown is not a mere hypothetical. In 2005, the federal government drew down the SPR following Hurricane Katrina. J.A.82-83; J.A.784. Similarly, in 2011 following disruption of oil supply in Libya, the federal government drew down the SPR. J.A.82-83; J.A.784. And the United States has exercised this emergency control most recently in response to the war in Ukraine. The government's direction of Defendants in supplying, operating, and drawing down the SPR relates to Plaintiffs' claims and justifies removal.

### 2. The record in these cases fills the specific evidentiary gaps found in *Baltimore IV*.

The *Baltimore IV* Court had explained that it was "left wanting for pertinent details about [Socal's] role in operating the Elk Hill Reserve" because the record was never clear if Socal produced any oil at the Reserve. 31 F.4th at 237. The Court thus "decline[d] to pass on the question of whether [the Elk Hills activities] satisfie[d] the 'acting under' prong." *Id.* at 234. The new evidence shows that Chevron predecessor Socal acted as the Navy's agent in operating the Elk Hills Reserve. *See* J.A.76;

44

J.A.778.  *Baltimore IV* also explained that the evidence there did not demonstrate that the federal government exercised control over Defendants when they drilled on the OCS.  31 F.4th at 232.  It said that "the lack of any specificity as to federal direction leaves us unable to conclude that the leases rise to the level of an unusually close relationship, as required by the first 'acting under' prong."  *Id.* at 232 n.22.  The new evidence shows that, under OCSLA leases, Defendants fulfilled basic governmental duties that the federal government would otherwise have had to perform itself.

> **(a)  Defendants acted under the U.S. Navy at Elk Hills National Petroleum Reserve No. 1.**

Chevron's predecessor Socal acted under federal officials in operating the National Petroleum Reserve No. 1 in Elk Hills for the federal government.  Elk Hills was a massive oil field in California, co-owned by the Navy and Socal.  J.A.72; J.A.774.  It cannot be dismissed as insignificant.  Indeed, in 1988, it was "the eighth[-]largest producing oil field in the country."  J.A.319; J.A.904.

Pursuant to an operating agreement between Socal and the Navy, Socal acted "in the employ" of the Navy.  J.A.76; J.A.778.  Crucially, this operating agreement is different from the Unit Production Contract

("UPC") for Elk Hills—the only evidence before the Court in *Baltimore IV*. *See* 31 F.4th at 237. The Court found that evidence deficient because it "simply ha[d] no idea whether production authorized by Congress [at Elk Hills] was carried out by [Socal]." *Id.* By contrast, the record here establishes that the Navy hired Socal to "perform[] a function" under "the exclusive control of the Secretary of the Navy" in operating Elk Hills for thirty-one years. J.A.77; J.A.778. For example, in 1974, after Socal questioned whether it was possible to produce 400,000 barrels per day, the Navy directed Socal to develop a plan to do so and rejected the Company's objections. J.A.77; J.A.778.

The background to the operating agreement is the UPC. During World War II, the Navy and Socal negotiated the UPC to govern production at Elk Hills. J.A.73-74; J.A.775-776. Without that agreement, "it would have been necessary for [the] Navy to produce [oil from] its lands." J.A.355; J.A.940. The UPC gave the Navy ultimate control over Elk Hills: If Socal and the Navy's representative disagreed on anything, the Secretary of the Navy made the final "binding" decision. J.A.75; J.A.776-777. The UPC afforded the Navy "exclusive control over the exploration, prospecting, development, and operation of" Elk Hills, which it could do

46

"directly with its own personnel" or with contractors.  J.A.296; J.A.881. The Navy elected to hire a contractor, noting that Socal "was the only large company capable of furnishing the facilities for such a development program."  J.A.76; J.A.778.

To enable Socal to develop and operate Elk Hills on behalf of the Navy, the two parties negotiated the operating agreement.  J.A.76-77; J.A.778.  Socal was responsible for "the work of exploring, prospecting, developing, and operating" Elk Hills.  J.A.367; J.A.952.  It performed its duties "on [the] Navy's behalf."  J.A.367; J.A.952.

The Operating Agreement subjected Socal to the Navy's rigorous control.  Socal was "in the employ of the Navy Department and [was] responsible to the Secretary thereof."  J.A.76; J.A.778.  For day-to-day operations, the Navy designated an "Officer in Charge" to oversee Socal. That Officer had extensive powers, including, for example:

- to specify which services Socal must provide, J.A.366; J.A.951;

- to control Socal's personnel, by requiring Socal to "disassociate" from Elk Hills work any employee he felt performed in an "unsatisfactory manner," J.A.368; J.A.953;

- to audit and to allow or disallow Socal's expenses, J.A.371; J.A.377; J.A.956; J.A.962; and

- to approve all subcontracts, J.A.376; J.A.961.

47

Socal, in turn, had to "at all times keep the Officer in Charge . . . fully informed." J.A.366; J.A.951. Socal was also required to maintain and produce to the Navy detailed records of its activities. J.A.373-374; J.A.958-959. And the Navy also had the final say in the relationship. If Socal and the Officer in Charge disagreed on anything, the Secretary of the Navy made the final decision, subject only to arbitrary and capricious review. J.A.377; J.A.962. Thus, the Navy exercised close supervision and control over Defendants' operations at Elk Hills.

If the Navy had not hired Socal to operate Elk Hills, it would have had to operate the oil field itself. It was "mandatory" that the Navy be able to produce oil from Elk Hills "in time of national emergency" because it was one of the "great sources of petroleum in the United States," according to Commodore W.G. Greenman, the Navy's Officer in Charge. J.A.348; J.A.933. At Elk Hills, Defendants "help[ed] or assist[ed] federal officers fulfill a basic governmental task, under the government's control or subjection, that the government would otherwise have to perform itself." *W. Va. State Univ.*, 23 F.4th at 301-02. Defendants thus acted under federal officers.

48

**(b)    Defendants produced oil and gas on the OCS under detailed federal mineral leases subject to federal officer supervision and direction.**

The Outer Continental Shelf Lands Act ("OCSLA") is a federal law, enacted to make oil and gas on the OCS "available for expeditious and orderly development" in keeping with "national needs." 43 U.S.C. § 1332(3). It governs production of oil and gas on submerged lands beyond three miles of the coast, accounting for billions of barrels of oil and trillions of cubic feet of natural gas. *See* J.A.194; J.A.1214-1215.

In *Baltimore IV*, the Court was "not convinced that the supervision and control to which OCSLA lessees are subject connote the sort of 'unusually close' relationship that courts have previously recognized as supporting federal officer removal." 31 F.4th at 232. Here, Defendants have introduced substantial new evidence showing considerable federal oversight, including the declaration of Professor Richard Tyler Priest, who cites various primary sources in detailing that for "more than six decades, the U.S. federal [OCS] program filled a national government need," J.A.193; J.A.1213 (footnote omitted), and that federal officials "supervised, directed, and controlled the rate of oil and gas production," J.A.237-238; J.A.1258.

49

Moreover, Defendants have also submitted evidence showing that Congress considered establishing a national oil company to meet its federal policy objectives, but instead decided to hire and supervise private companies like Defendants. J.A.58-59; J.A.760. Defendants thus performed—and continue to perform to this day—essential services for the government under the direct supervision and control of federal officers, services that the United States has determined it would need to perform itself if Defendants did not. J.A.59-60; J.A.760-761.

The federal government used oil and gas firms to develop the OCS as a national security resource. It "procured the services of oil and gas firms to develop urgently needed resources on federal offshore lands that the federal government was unable to do on its own" because it lacked the experience, expertise, and technological capabilities. J.A.62; J.A.764. In using these services, the federal government "dictated the terms, locations, methods[,] and rates of hydrocarbon production on the OCS." J.A.62; J.A.764. Defendants assisted the government as "agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." J.A.62; J.A.764. The OCS leases provide a textbook example of acting under a federal officer: The oil and gas companies used their

50

expertise to perform a vital governmental function subject to detailed federal oversight.

As detailed below, Congress considered but rejected proposals to create a national oil company to develop the OCS. Those proposals go to a crucial element of the acting under analysis—whether the federal government would have had to perform the work itself in the absence of a contractor—and they were not before the *Baltimore IV* Court.

In 1978, Congress amended OCSLA to ensure more production on the OCS. 43 U.S.C. § 1802(1)-(2); *see also California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981). As part of debate on that bill, Congress considered creating a national oil company to supplement or replace private oil and gas production on the OCS. Senator Fritz Hollins called for the creation of "a national oil company that would 'conduct this program by using the same drilling and exploration firms that are usually hired by oil companies.'" J.A.242 (quoting 94 Cong. Rec. S903-11 (Jan. 27, 1975)); *accord* J.A.1262. The Senate Commerce Committee even held hearings on a bill to establish a Federal Oil and Gas Corporation, to be known as "Fogco." Fogco would have been a federally owned

body with the right to develop up to 20% of the mineral resources on the OCS. J.A.242-243; J.A.1262-1263.

Ultimately, the federal government chose to perform these essential tasks by contracting with private energy companies, including Defendants, which fulfilled governmental needs under federal supervision and control. But the fact that Congress considered nationally owned alternatives underscores that without Defendants' service, the federal government would have been required, as a matter of energy security, to develop mineral reserves on the OCS directly, on its own.

OCS leases impose extensive oversight on Defendants. Defendants' new evidence demonstrates that the federal government does not simply receive royalties from Defendants and set them loose on the OCS. Instead, the federal government retains the power to "direct how oil and gas resources would be extracted and sold from the OCS." J.A.207-208; J.A.1228. To implement that power, the Department of the Interior deputizes supervisors. Those supervisors have "substantial discretion," J.A.211; J.A.1231, in how to implement the leases, giving the government effective control over much of Defendants' operations. The government supervisor can tell the companies to "promptly drill and produce" wells,

52

to suspend operations, to submit sales contracts and well logs, and to fol-
low specifications for "samples, tests, and surveys." J.A.207-208;
J.A.1228-1229. And unlike any ordinary commercial lease, the govern-
ment retains the authority to compute royalties. J.A.281; J.A.866. Es-
sentially, the government tells Defendants how much rent to pay. The
leases thus exhibit extraordinary federal control over Defendants in their
OCS operations.

The federal government also exerted substantial control by issuing
highly specific and technical orders, known as "OCS Orders." These or-
ders exact minute control over Defendants' OCS operations. For exam-
ple, OCS Order No. 2 "dictated the minimum depth and methods for ce-
menting well conductor casing in place" and other safety standards.
J.A.212; J.A.1232. It set forth these requirements in eighteen pages of
rigorous detail. Dep't of Interior, OCS Order No. 2 (Jan. 1, 1975),
https://pubs.usgs.gov/unnumbered/25325/report.pdf. OCS Order No. 3
"prescribed the minimum plugging and abandonment procedures for all
wells drilled 'in order to prevent possible migration of oil, gas, or water
between formations or to the surface.'" J.A.212 (quoting U.S. Geological
Survey, Monthly Engineering Report, Conservation Division, Oil and Gas

Leasing Branch, Gulf Coast Region, Volume 125 (Jan.-Mar. 1958), RG 57); *accord* J.A.1232-1233. These orders controlled the fine details of how Defendants operated on the OCS. And supervisors actually enforced them against Defendants. *See*, *e.g.*, *Arco Oil & Gas Co.,* 1982 WL 961730 (Min. Mgmt. Serv. Apr. 9, 1982) (sustaining civil penalty assessed against Marathon subsidiary for violating OCS Order No. 2). This new evidence not before the *Baltimore IV* Court makes clear that Defendants "acted under" federal officers in their OCS operations.

*       *       *

For decades, Defendants worked under the direction and close supervision of federal officers to produce fuel in support of key federal goals, including national defense and energy security. These activities are indivisible from Defendants' non-federal conduct and demonstrate that Defendants acted under federal officers.

### 3. Defendants have asserted colorable federal defenses.

Defendants need not win their case at the removal stage. *Acker*, 527 U.S. at 431. They need only assert a plausible federal defense. *Express Scripts*, 996 F.3d at 254. To do so, Defendants must simply assert the defense and plead facts which, if proven, would establish a prima

54

facie defense. *See Papp*, 842 F.3d at 814-15. After all, the point of federal officer removal is to ensure a federal forum for federal defenses. *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981). Notably, neither the *Baltimore IV* Court nor the district court addressed this prong, and Plaintiffs failed to challenge this prong before the district court. *See* ECF 141 at 15-26; ECF 143 at 3.

Defendants raised three colorable federal defenses stemming from their status as federal contractors.

*First*, defendants raised the government contractor defense. J.A.107-108; J.A.803. This defense applies against state-law products liability claims when (1) the suit involves a unique federal interest and (2) holding the defendant liable under state law would present a significant conflict with federal policy. *See Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988).

Here, there is a core federal interest involved in Defendants' supplying fuel to the military and ensuring an adequate domestic supply of oil and gas. *See Boyle,* 487 U.S. at 512 (holding federal contractor immune from suit over "a particular feature of military equipment"); *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21 (1940) (holding federal

contractors immune from damages for the construction of dikes on the Missouri River under federal direction). This Court has already warned that "the judiciary should hesitate to intervene in matters of military procurement contracts." *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016). And that case further recognizes that "a higher risk of liability for government contractors would increase costs to the government while decreasing the supply of contractors and research and development in military equipment." *Id.* The allegations in Defendants' notice of removal, if taken as true, plausibly establish that Defendants may invoke the federal contractor defense.

*Second*, Defendants raised a federal preemption defense. J.A.107; J.A.803. Conflict preemption occurs where "compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (internal quotation marks omitted); *see also Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010). Defendants' allegations establish that Plaintiffs' claims are preempted by the Clean Air Act ("CAA"). *See* J.A.28-29; J.A.806-808. This Court has already held that the CAA preempts state

common-law claims to remedy harms arising from out-of-state emissions. *See North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 303-06 (4th Cir. 2010). Here, Plaintiffs attempt to bring state common-law claims for alleged injuries purportedly resulting from the aggregate effects of global emissions that have been discharged almost entirely outside of the State—that is squarely preempted by the CAA.

Similarly, Plaintiffs' purportedly state-law claims are also barred by federal law. Under our federal constitutional structure, claims that seek relief for injuries attributable to global emissions are necessarily and exclusively governed by federal law, and any remedies under federal law have been displaced by the CAA. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421-23 (2011) ("*AEP*") ("the basic scheme of the Constitution . . . demands" that "federal common law" govern these types of disputes, and the CAA "displaced" any remedies for such suits); *Illinois v. City of Milwaukee*, 406 U.S. 91, 103, 105 n.6 (1972) ("*Milwaukee I*") (the "basic interests of federalism" embodied in the Constitution "demand[]" that federal law govern disputes involving "air and water in their ambient or interstate aspects").

*Third*, Defendants asserted federal contractor immunity.  J.A.107-108; J.A.803; *see also Campbell-Ewald Co. v. Gomez,* 577 U.S. 153 (2016).  Government contractors who adhere to their contracts and to federal law are immune from suit to the same extent as the federal government.  *See id.* at 166-67; *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 643 (4th Cir. 2018).  The federal government would be immune from at least some claims in this suit.  *See United States v. Gaubert*, 499 U.S. 315, 322 (1991).  Because Defendants are not alleged to have violated their contracts or federal law, so too are Defendants immune from suits concerning their provision of fuels to the U.S. military and their mainte-nance of federal extraction and production operations.  *See Yearsley*, 309 U.S. at 20-21 ("it is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will").

Defendants also raised an array of constitutional defenses. J.A.108-109; J.A.803-805.  Defendants explained that Plaintiffs' claims are barred by the dormant Commerce Clause because they have "the practical effect" of "control[ling] conduct beyond the boundaries of

[Maryland]." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336-37 (1989). In fact, Plaintiffs' claims would essentially regulate the entire global energy market. Defendants also explained that such an extraterritorial impact would violate the Due Process Clause. *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

Additionally, considering the federal government's efforts to negotiate responses to climate change on the international stage, the foreign affairs doctrine bars these suits because it prohibits state law from "impair[ing] the effective exercise of the Nation's foreign policy." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 (2003).

Finally, the *Noerr-Pennington* doctrine precludes civil liability for lobbying activity. *See Baltimore Scrap Corp. v. David J. Joseph Co.*, 81 F. Supp. 2d 602, 620 (D. Md. 2000) ("*Noerr-Pennington* immunity . . . applies to . . . state common law claims."), *aff'd*, 237 F.3d 394 (4th Cir. 2001). To the extent that Plaintiffs' claims target Defendants' statements to the government or to influence matters of public policy, *see* J.A.616; J.A.628; J.A.1374; J.A.1386, *Noerr-Pennington* bars them.

Defendants have the right to a federal forum so long as a single federal defense is plausible. Here, each defense is plausible, and the

notices of removal contain allegations that suffice to establish colorable defenses.

## II. The Action Is Removable Because Plaintiffs' Claims Necessarily Raise Disputed And Substantial Issues Under The First Amendment.

Separately, even under Plaintiffs' erroneous argument that their claims are premised solely on alleged misrepresentations, those claims would still be removable under the Supreme Court's decision in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), because they necessarily incorporate federal elements imposed by the First Amendment. *Baltimore IV* did not consider this argument, either.

Under *Grable*, lawsuits alleging only state-law causes of action may still "arise under" federal law if they require resolution of substantial, disputed federal questions, thereby justifying removal. *See* 545 U.S. at 313-14. The Supreme Court has "recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Id*. at 312. The doctrine applies where the federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without

disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

Here, even if the Court were to construe Plaintiffs' claims as limited to alleged misrepresentations regarding the effect of Defendants' oil-and-gas products, those claims still would arise under federal law for purposes of *Grable* jurisdiction, because they necessarily incorporate affirmative federal constitutional elements imposed by the First Amendment. Plaintiffs cannot prevail without demonstrating that the alleged misrepresentations are not protected by the First Amendment.

Plaintiffs argue that their claims turn on promotion and misrepresentation—*i.e.*, commercial speech (as they relate to advertising) and petitioning for redress of grievances (as they relate to lobbying and statements before Congress or legislatures). These sorts of activities are presumptively protected by the First Amendment. The claims in this case thus "involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law." *Grable*, 545 U.S. at 313 (alterations in original).

The Supreme Court has made clear that where nominally state-law tort claims target speech on matters of public concern like climate

change, the First Amendment injects affirmative federal-law elements into the plaintiff's cause of action, obligating the plaintiff to prove elements such as factual falsity, actual malice, and causation of actual damages. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774-76 (1986) (state common law standards include "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 285-86 (1964) (public officials have burden of proving with "convincing clarity" that "statement was made with 'actual malice'"); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").

The district court erred by assuming that those Supreme Court cases involved merely "defenses." J.A.1485. These First Amendment issues are constitutionally required *elements* of the plaintiff's cause of action, for which the *plaintiff* "bear[s] the burden" of proof—by clear and convincing evidence—as a matter of federal law. *See Hepps*, 475 U.S. at 774-76; *Sullivan*, 376 U.S. at 279-80, 285-86 (plaintiff public officials bear burden of proving with "convincing clarity" that "statement was made

62

with 'actual malice'"). And this requirement extends outside of the defamation context to a wide range of state-law tort causes of action. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53, 56 (1988) (extending First Amendment requirements beyond defamation context); *Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009) (similar), *aff'd*, 562 U.S. 443 (2011).

As a result, to the extent that Plaintiffs' claims involve allegations of misrepresentation, that provides an independent basis for federal jurisdiction under *Grable*. The constitutional proof requirements for speech-related claims are "essential" elements of Plaintiffs' claims, and Defendants' First Amendment rights will be "supported" or "defeated" depending on whether Plaintiffs meet their high burden of proof on those federal elements of their claims. *Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936). Under Plaintiffs' stated causes of action, the court would have to address whether the First Amendment protects Defendants' speech on matters of public concern. When "a court will have to construe the United States Constitution" to decide Plaintiffs' claims, the claims "necessarily raise a stated federal issue" under *Grable*, and federal jurisdiction is proper. *See Ortiz v. Univ. of Med. & Dentistry of N.J.*, 2009 WL

63

737046, at *3 (D.N.J. Mar. 18, 2009) (denying plaintiff's motion to remand where his state-law claim depended on question whether a state entity impinged on his First Amendment right by retaliating against him for reporting information to that entity).

The district court took the position that protected speech-related issues do not appear on the face of the Complaints because "Plaintiffs bring nuisance, failure to warn, and trespass claims, none of which on their face necessarily raise First Amendment concerns." J.A.1485. But that is irreconcilable with the court's rejection of federal officer removal. Defendants' argument for why federal officer removal is appropriate is that Plaintiffs' alleged injuries (as well as their causes of action and their asserted basis for relief) stem from global climate change—which, Plaintiffs allege, came about in large part from the combustion of Defendants' fossil fuels, a substantial portion of which were extracted and produced under the direction of federal officers. The district court rejected this position, concluding that the only relevant conduct was Defendants' alleged "misrepresentation of the harms of fossil fuel products." J.A.1482. Plaintiffs cannot have it both ways. Either their claims do *not* turn on alleged speech acts alone, in which case federal officer removal is

appropriate, or they *do* focus in substantial part on actions that are presumptively protected by the First Amendment, in which case removal under *Grable* is proper.

The district court was also concerned that ruling in Defendants' favor on this issue would "dramatically expand *Grable*." J.A.1484. To be sure, most state-law misrepresentation claims are not subject to removal, but that is because they do not implicate a "substantial" federal issue. The Supreme Court has explained that "[t]he substantiality inquiry" looks "to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. In most state-law cases, allegations regarding misrepresentations will not impact the federal system. Here, however, unlike in a more run-of-the-mill state-law misrepresentation case, the federal interests and alleged speech acts at issue are uniquely substantial.

As the Supreme Court has explained, First Amendment interests are at their apex where, as here, a governmental entity seeks to use state law to regulate disfavored speech on issues of uniquely "public concern." *Hepps*, 475 U.S. at 775. Indeed, "[c]limate change has staked a place at the very center of this Nation's public discourse," and "its causes, extent,

65

urgency, consequences, and the appropriate policies for addressing it" are "hotly debated." *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 347-48 (2019) (Alito, J., dissenting from denial of certiorari). Freedom of speech is "most seriously implicated . . . in cases involving disfavored speech on important political or social issues," including climate change, which is "one of the most important public issues of the day." *Id*. at 344, 346, 348 (noting that a federal forum is especially warranted in suits "concern[ing] a political or social issue that arouses intense feelings," because "a plaintiff may be able to bring suit in whichever jurisdiction seems likely to have the highest percentage of jurors who are sympathetic to the plaintiff's point of view").

Plaintiffs are public entities seeking to use the machinery of their state courts to impose *de facto* regulations on Defendants' nationwide speech on issues of national concern. Plaintiffs' attempt to regulate Defendants' speech on the important public matter of climate change through litigation thus necessarily raises substantial First Amendment questions that belong in federal court. Given the compelling federal interests at stake here, federal courts may entertain the claims at issue in this case "without disturbing any congressionally approved balance of

66

federal and state judicial responsibilities," making removal appropriate. *Grable*, 545 U.S. at 314.

### III. Defendants Preserve Additional Arguments That Plaintiffs' Claims Arise Under Federal Law.

Defendants also preserve their arguments that Plaintiffs' claims arise under federal law because federal law necessarily and exclusively governs claims seeking relief for harms allegedly stemming from interstate and international pollution. *See*, *e.g.*, *Milwaukee I*, 406 U.S. 91; *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981); *AEP*, 564 U.S. at 421-23; J.A.19-27; J.A.724-734. Defendants acknowledge that this Court rejected these arguments in *Baltimore IV*, *see* 31 F.4th at 207, but Defendants nevertheless wish to preserve them.

Furthermore, Plaintiffs' claims raise and depend on the resolution of disputed, substantial federal questions for the same reasons, and also relate to the federal government's exclusive control over foreign affairs and treaty interpretation involving international climate accords, as well as other issues of constitutional law under the Interstate and Foreign Commerce Clauses and Due Process Clause. The claims are therefore removable under *Grable*. And Plaintiffs' claims "aris[e] out of, or in connection with" operations on the OCS, 43 U.S.C. § 1349(b)(1).

67

## CONCLUSION

The Court should reverse the district court's remand order.

Additionally, Defendants respectfully request oral argument in this appeal.  As described above, removal is proper for at least two reasons not yet addressed by this Court.  Given the complexity of the issues presented, Defendants submit that oral argument would be beneficial to the resolution of this case.

January 9, 2023

Respectfully submitted,

/s/ David B. Hamilton
David B. Hamilton
Sarah E. Meyer
Hillary V. Colonna
WOMBLE BOND DICKINSON (US) LLP
100 Light Street, 26th Floor
Baltimore, MD 21202
Telephone: (410) 545-5800
Facsimile: (410) 545-5801
E-mail: david.hamilton@wbd-us.com
E-mail: sarah.meyer@wbd-us.com
E-mail: hillary.colonna@wbd-us.com

Matthew J. Peters
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
E-mail: matthew.peters@lw.com

Steven M. Bauer
Margaret A. Tough
Katherine A. Rouse
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: steven.bauer@lw.com
E-mail: margaret.tough@lw.com
E-mail: katherine.rouse@lw.com

Jameson R. Jones
Daniel R. Brody
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
E-mail: jameson.jones@bartlit-beck.com
E-mail: dan.brody@bartlit-beck.com

*Attorneys for Defendants-Appellants ConocoPhillips and ConocoPhillips Company*

/s/ Ty Kelly Cronin
Ty Kelly Cronin
Alison C. Schurick
Kyle S. Kushner
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ P.C.
100 Light Street, 19th Floor
Baltimore, MD 21202
Telephone: (410) 862-1049
Facsimile: (410) 547-0699
E-mail: tykelly@bakerdonelson.com
E-mail: aschurick@bakerdonelson.com
E-mail: kskushner@bakerdonelson.com

/s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr.
William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
E-mail: tboutrous@gibsondunn.com
E-mail: wthomson@gibsondunn.com

Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
E-mail: aneuman@gibsondunn.com

Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
E-mail: thungar@gibsondunn.com

Joshua D. Dick
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

*Attorneys for Defendants-Appellants Chevron Corporation and Chevron U.S.A. Inc.*

69

/s/ *Steven M. Bauer*
Steven M. Bauer
Margaret A. Tough
Katherine A. Rouse
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538 Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: steven.bauer@lw.com
E-mail: margaret.tough@lw.com
E-mail: katherine.rouse@lw.com

Matthew J. Peters
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
E-mail: matthew.peters@lw.com

*Attorneys for Defendants-Appellants*
*Phillips 66 and Phillips 66 Company*

/s/ *Martha Thomsen*
Martha Thomsen
Megan H. Berge
BAKER BOTTS LLP
700 K Street, N.W.
Washington, DC 20001-5692
Telephone: (202) 639-7863
Facsimile: (202) 508-9329
E-mail: martha.thomsen@bakerbotts.com
E-mail: megan.berge@bakerbotts.com

J. Scott Janoe
BAKER BOTTS LLP
910 Louisiana Street
Houston, TX 77002
Telephone: (713) 229-1553
Facsimile: (713) 229-7953
E-mail: scott.janoe@bakerbotts.com

*Attorneys for Defendant-Appellant Hess Corp.*

/s/ Brian D. Schmalzbach
Brian D. Schmalzbach
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
Telephone: (804) 775-4746
Facsimile: (804) 698-2304
E-mail: bschmalzbach@mcguirewoods.com

Ava E. Lias-Booker
MCGUIREWOODS LLP
500 E. Pratt Street, Suite 1000
Baltimore, MD 21202-3169
Telephone: (410) 659-4400
Facsimile: (410) 659-4599
E-mail: alias-booker@mcguirewoods.com

Melissa O. Martinez
MCGUIREWOODS LLP
500 E. Pratt Street, Suite 1000
Baltimore, MD 21202-3169
Telephone: (410) 659-4400
Facsimile: (410) 659-4599
E-mail: mmartinez@mcguirewoods.com

*Attorneys for Defendant-Appellant American Petroleum Institute*


/s/ David C. Frederick
David C. Frederick
Daniel S. Severson
KELLOGG, HANSEN, TODD, FIGEL
    & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
E-mail: dfrederick@kelloghansen.com
E-mail: dseverson@kelloghansen.com

*Attorneys for Defendants-Appellants Shell plc (f/k/a Royal Dutch Shell plc) and Shell USA, Inc. (f/k/a Shell Oil Company)*


/s/ Tracy A. Roman
Tracy A. Roman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
E-mail: troman@crowell.com

Honor R. Costello
CROWELL & MORING LLP
590 Madison Avenue, 20th Fl.
New York, NY 10022
Telephone: (212) 223-4000
Facsimile: (212) 223-4134
E-mail: hcostello@crowell.com

*Attorneys for Defendants-Appellants CONSOL Energy Inc. and CONSOL Marine Terminals LLC*


/s/ Noel J. Francisco
Noel J. Francisco
David M. Morrell
J. Benjamin Aguiñaga
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
E-mail: njfrancisco@jonesday.com
E-mail: dmorrell@jonesday.com
E-mail: jbaguinaga@jonesday.com

David C. Kiernan
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700
E-mail: dkiernan@jonesday.com

*Attorneys for Defendant-Appellant CNX Resources Corp.*

71

/s/ Thomas K. Prevas
Thomas K. Prevas
SAUL EWING ARNSTEIN & LEHR LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-4359
Telephone: (410) 332-8683
Facsimile: (410) 332-8123
E-mail: thomas.prevas@saul.com

*Attorneys for Defendants-Appellants
Crown Central LLC, Crown Central New
Holdings LLC, and Rosemore, Inc.*


/s/ Warren N. Weaver
Warren N. Weaver
WHITEFORD TAYLOR &
PRESTON LLP
7 Saint Paul Street., Suite 1400
Baltimore, MD 21202
Telephone: (410) 347-8757
Facsimile: (410) 223-4177
E-mail: wweaver@wtplaw.com

EIMER STAHL LLP
Nathan P. Eimer
Pamela R. Hanebutt
Lisa S. Meyer
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
E-mail: neimer@eimerstahl.com
E-mail: phanebutt@eimerstahl.com
E-mail: lmeyer@eimerstahl.com

Robert E. Dunn
99 S. Almaden Blvd. Suite 642
San Jose, CA 95113
Telephone: (408) 889-1690
E-mail: rdunn@eimerstahl.com

*Attorneys for Defendant-Appellant CITGO Pe-
troleum Corporation*

/s/ Craig A. Thompson
Craig A. Thompson
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: (410) 244-7605
Facsimile: (410) 244-7742
E-mail: cathompson@venable.com

Theodore V. Wells, Jr.
Daniel J. Toal
Yahonnes Cleary
Caitlin E. Grusauskas
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3089
Facsimile: (212) 492-0089
E-mail: twells@paulweiss.com
E-mail: dtoal@paulweiss.com
E-mail: ycleary@paulweiss.com
E-mail: cgrusauskas@paulweiss.com

*Attorneys for Defendants-Appellants Exxon
Mobil Corporation and ExxonMobil Oil Corpo-
ration*

/s/ *John B. Isbister*
John B. Isbister
Jaime W. Luse
TYDINGS & ROSENBERG LLP
One East Pratt Street, Suite 901
Baltimore, MD 21202
Telephone: (410) 752-9700
Facsimile: (410) 727-5460
E-mail: jisbister@Tydings.com
E-mail: jluse@Tydings.com

ARNOLD & PORTER KAYE
SCHOLER LLP
Nancy Milburn
Diana Reiter
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
E-mail: nancy.milburn@arnoldporter.com
E-mail: diana.reiter@arnoldporter.com

John D. Lombardo
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844 Tele-
phone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail: matthew.heartney@arnoldporter.com

Jonathan W. Hughes
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3156
Facsimile: (415) 471-3400
E-mail: jonathan.hughes@arnoldporter.com

*Attorneys for Defendants-Appellants BP plc,
BP America Inc., and BP Products North
America Inc.*

/s/ *Mark S. Saudek*
Mark S. Saudek
GALLAGHER EVELIUS & JONES LLP
218 North Charles Street, Suite 400
Baltimore, MD 21201
Telephone: (410) 347-1365
Facsimile: (410) 468-2786
E-mail: msaudek@gejlaw.com

Robert Reznick
ORRICK, HERRINGTON
& SUTCLIFFE, LLP
1152 15th Street NW
Washington, DC 20005
Telephone: (202) 339-8600
Facsimile: (202) 339-8500
E-mail: rreznick@orrick.com

James Stengel
ORRICK, HERRINGTON
& SUTCLIFFE, LLP
51 West 52nd Street
New York, New York 10019-6142
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
E-mail: jstengel@orrick.com

Catherine Y. Lui
ORRICK, HERRINGTON
& SUTCLIFFE, LLP
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5571
Facsimile: (415) 773-5759
E-mail: clui@orrick.com

*Attorneys for Defendants-Appellants Marathon
Oil Corporation and Marathon Oil Company*

/s/ Shannon S. Broome
Shannon S. Broome
Ann Marie Mortimer
HUNTON ANDREWS KURTH LLP
50 California Street, Suite 1700
San Francisco, CA 94111
Telephone: (415) 975-3700
Facsimile: (415) 975-3701
E-mail: SBroome@HuntonAK.com
E-mail: AMortimer@HuntonAK.com

Shawn Patrick Regan
HUNTON ANDREWS KURTH LLP
200 Park Avenue, 52nd Floor
New York, NY 10166
Telephone: (212) 309-1000
Facsimile: (212) 309-1100
E-mail: SRegan@HuntonAK.com

*Attorneys for Defendants-Appellants Marathon Petroleum Corporation and Speedway LLC*

74

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type-style, and type-volume limitations. This brief was prepared using a proportionally spaced type (New Century Schoolbook, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,997 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

/s/ *Theodore J. Boutrous Jr.*
Theodore J. Boutrous, Jr.

GIBSON, DUNN & CRUTCHER LLP

*Attorney for Defendants-Appellants*
*Chevron Corp. and Chevron U.S.A.*
*Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Theodore J. Boutrous Jr.*
Theodore J. Boutrous, Jr.

GIBSON, DUNN & CRUTCHER LLP

*Attorney for Defendants-Appellants*
*Chevron Corp. and Chevron U.S.A.*
*Inc.*

## STATUTORY ADDENDUM

Pursuant to Fourth Circuit Local Rule 28(b) and Federal Rule of Appellate Procedure 28(f), this addendum includes pertinent statutes, reproduced verbatim:

**Statute**                                                              **Page**

28 U.S.C. § 1291 ................................................................78

28 U.S.C. § 1292 ................................................................78

28 U.S.C. § 1442 ................................................................79

28 U.S.C. § 1447 ................................................................80

### 28 U.S.C. § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

### 28 U.S.C. § 1292. Interlocutory decisions

. . . .

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon,

in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

. . . .

### 28 U.S.C. § 1442. Federal officers or agencies sued or prosecuted

(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1)     The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for

the apprehension or punishment of criminals or the collection of the revenue.

(2)    A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

(3)    Any officer of the courts of the United States, for or relating to any act under color of office or in the performance of his duties;

(4)    Any officer of either House of Congress, for or relating to any act in the discharge of his official duty under an order of such House.

. . . .

**28 U.S.C. § 1447. Procedure after removal generally**

. . . .

(d) An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order

80

remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.